# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **BRENDA KAYE MILLER,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:08cv00065 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** | ) | SENIOR UNITED STATES DISTRICT JUDGE |
| Defendant. | ) | |

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Brenda Kaye Miller, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2008). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It

-1-

consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Miller filed her application for DIB on May 18, 2006, alleging disability as of February 1, 2004, due to fibromyalgia, irritable bowel syndrome, ("IBS"), migraines, knee/feet problems, sleep problems, back pain, panic attacks and weakness in her hands. (Record, ("R."), at 60-62, 76.) The claim was denied initially and upon reconsideration. (R. at 29-30, 33-40.) Miller then requested a hearing before an administrative law judge, ("ALJ"). The ALJ held a hearing on April 10, 2008, at which Miller was represented by counsel. (R. at 376-406.)

By decision dated May 5, 2008, the ALJ denied Miller's claim. (R. at 11-17.) The ALJ found that Miller met the insured status requirements of the Act for DIB purposes through December 31, 2004. (R. at 16.) The ALJ also found that Miller had not engaged in substantial gainful activity since the alleged onset date. (R. at 17.) The ALJ determined that the medical evidence established that Miller suffered from severe impairments, namely headaches, back pain, fibromyalgia, chronic obstructive pulmonary disease, ("COPD"), anxiety and depression. (R. at 17.) However, the ALJ found that Miller did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1 at any time prior to January 1, 2005. (R. at 17.) He further found that Miller's allegations regarding her limitations were not totally credible for the time period prior to January

-2-

1, 2005. (R. at 17.) The ALJ found that, from the alleged onset date through the date Miller was last insured for DIB purposes, she retained the residual functional capacity to walk for two hours at a time, up to a total of four hours in an eight-hour period, and sit or stand for two hours at a time, up to a total of eight hours in an eight-hour period. (R. at 17.) In addition, the ALJ explained that Miller's capacity for work at the light[1] and sedentary[2] levels of exertion was reduced by her inability to perform jobs that require repetitive lifting or exposure to fumes, allergens or extremes of temperature or humidity, or jobs that involve repetitive climbing, crawling or exposure to heights, or more than occasional balancing, stooping, kneeling or crouching. (R. at 17.) The ALJ determined that Miller's past relevant work as a secretary and daycare worker did not require the performance of work-related activities precluded by her residual functional capacity, noting that, at no time prior to January 1, 2005, did the limitations imposed by her impairments prevent her from performing her past relevant work. (R. at 17.) Therefore, the ALJ concluded that Miller was not under a disability as defined in the Act and that she was not entitled to benefits. (R. at 17.) *See* 20 C.F.R. § 404.1520 (2008)

After the ALJ issued his decision, Miller pursued her administration appeals, (R. at 10), but the Appeals Council denied her request for review. (R. at 6-9.) Miller then filed this action seeking review of the ALJ's unfavorable decision, which now

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, she also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2008).

[2]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. § 404.1567(a) (2008).

stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2008). This case is before the court on Miller's motion for summary judgment, which was filed on May 11, 2009, and the Commissioner's motion for summary judgment, which was filed on July 15, 2009.

## II. Facts

Miller was born in 1949, (R. at 60), which means that, during the relevant time period, she was classified as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). Miller has a high school education and past relevant work experience as a secretary and daycare worker. (R. at 82, 84.)

At the hearing before the ALJ on April 10, 2008, Miller testified that in her past employment as a daycare worker she was required to lift children, noting that she had to lift over 20 pounds. (R. at 381-82, 385.) She acknowledged that the job allowed her to sit for a portion of the day, but explained that she was required to stand throughout most of the day. (R. at 382.) Miller testified that she stopped working at the daycare facility when the business closed, stating that she did not seek work thereafter. (R. at 383.) She stated that while working at the daycare facility, she had to leave work frequently due to breathing problems and migraines. (R. at 383.) She also testified that lifting the children caused her "back [to] give out on [her,]" which often forced her to call in and have someone else work for her. (R. at 387.)

Miller also testified that, prior to her employment as a daycare worker, she worked for several years as a secretary at a lumber company. (R. at 383.) She

-4-

indicated that she performed general offices tasks, including billing and payroll.  (R. at 383.)  She testified that she ceased her work as a secretary because she experienced difficulty lifting 20-pound boxes when organizing old files.  (R. at 383, 385.)

Miller testified that she suffered from fibromyalgia, explaining that her condition caused pain when breathing and also caused exhaustion.  (R. at 388.)  She further explained that, as of 2004, she had to lie down for "at least a couple [of] hours or more" each day.  (R. at 388-89.)  She indicated that fibromyalgia caused pain throughout her body, noting that it was "terrible pain."  (R. at 389.)  Miller stated that the pain occurred daily, commenting that it was more intense on certain days.  (R. at 389.)  She testified that, as of 2004, due to the exhaustion, she was only working half days.  (R. at 389.)  She also testified that she suffered from three migraine headaches per night that sometimes lasted up to four days.  (R. at 389.)  Miller stated that, when she had a migraine, she was forced to go to bed because of sensitivity to any noise or light.  (R. at 390.)  Miller also referenced back problems, indicating that her back pain prohibited her from standing for extended periods.  (R. at 390.)  She testified that she could perform activities such as washing dishes and vacuuming for no longer than 20 minutes at a time.  (R. at 390.)  She said that after performing such a task, she would have to rest for 20 to 30 minutes.  (R. at 390.)  Miller explained that she also suffered from knee problems, noting that her physician recommended surgery.  (R. at 390.)

Miller testified that she also received counseling, which allowed her to "cry on [the counselor's] shoulders."  (R. at 391.)  She stated that she began counseling in 2006 due to panic attacks.  (R. at 392.)  In describing her panic attacks, Miller stated that they caused shortness of breath and caused her heart to race.  (R. at 392.)  She

-5-

also explained that the attacks lasted for up to three hours, causing pain in her arms and causing her palms to sweat. (R. at 392-93.) She testified that she experienced these symptoms in 2004, but had not been diagnosed with panic attacks at that time. (R. at 393.) She estimated that, in 2004, she suffered from panic attacks two or three times per month, noting that she "just couldn't get out" of the house. (R. at 393.)

Dr. Marvin Gardner, M.D., a medical expert, also was present and testified at the hearing. (R. at 394-97.) Dr. Gardner acknowledged that he was called to testify as an independent psychological medical expert. (R. at 395.) Based upon the medical records, Dr. Gardner opined that Miller met listing 12.04 for affective disorder, depressive syndrome, and also 12.06 for anxiety-related disorders. (R. at 395-96.) Dr. Gardner testified that there was insufficient evidence prior to February 28, 2006, to offer any opinion as to whether or not Miller met or equaled any of those listings before that time period. (R. at 396.) Upon questioning from Miller's counsel, Dr. Gardner testified that there appeared to be a link between depression and fibromyalgia, noting that treatment regimens for each condition are very similar. (R. at 396.) Miller's counsel asked Dr. Gardner if the medical records revealed a diagnosis of fibromyalgia, to which Dr. Gardner explained that he was not certain, as he only reviewed the psychological evidence. (R. at 397.)

Jean Hambrick, a vocational expert, also was present and testified at the hearing. (R. at 397-406.) Hambrick testified that employment as a daycare worker normally was classified as light, semiskilled work. (R. at 400.) However, she explained that while the evidence of record showed that Miller's employment was performed at the light level, her testimony at the hearing indicated that the work was

-6-

performed at a level closer to medium work.[3]  (R. at 400.)  In addition, Hambrick identified Miller's past secretarial work as skilled and sedentary.  (R. at 400.)  The ALJ asked Hambrick to consider an individual of advanced age, who was closely approaching advanced age at the onset date, with a high school education and conditions such as migraines, fibromyalgia, back pain, bursitis, chondromalacia, mild arthritis, a history of one angioplasty, COPD, panic attacks, a depressed mood, anxiety and a borderline to low average mental level.  (R. at 400.)  The ALJ also asked Hambrick to consider that such an individual could perform light work, but needed to avoid repetitive lifting, exposure to fumes, allergens and extremes of temperature or humidity.  (R. at 400-01.)  Considering the above-mentioned limitations, Hambrick testified that Miller would be able to perform her past relevant work as the jobs are normally performed in the workplace.  (R. at 401.)

In a second hypothetical, the ALJ asked Hambrick to consider the previously mentioned limitations and that the individual would be limited to sedentary work.  (R. at 401.)  Hambrick testified that such an individual would be able to perform Miller's past employment as a secretary.  (R. at 401.)  In a third hypothetical, the ALJ asked Hambrick to consider an individual that could lift up to 40 pounds, 20 pounds frequently, sit/stand for eight hours total, in either position, but for only two hours at a time and who could walk for four hours, only two hours at a time.  (R. at 401.)  In addition, Hambrick was asked to consider that such an individual could perform no repetitive climbing, crawling or be exposed to heights, the individual's other exertions would be limited to occasional and she should avoid repetitive lifting and the

---

[3]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects up to 25 pounds.  If an individual can perform medium work, she also can perform sedentary and light work.  *See* 20 C.F.R. § 404.1567(c) (2008).

-7-

previously mentioned exposures.  (R. at 401-02.)  Based upon these limitations, Hambrick opined that such an individual would be able to perform all of Miller's past relevant work.  (R. at 402.)  Next, the ALJ asked Hambrick to consider an individual who could lift and carry five pounds total, lift and carry less than five pounds frequently, stand and walk less than two hours each, 15 to 20 minutes at a time, and sit four to five hours, 20 to 30 minutes at a time.  (R. at 402.)  Furthermore, the ALJ added that such an individual would not be able to stand and walk for a substantial period of time, due to the fact that she would be up and down frequently.  (R. at 402.)  Hambrick also was asked to consider that the individual would be unable to perform repetitive reaching, handling and feeling, and she would be limited to pulling and/or pushing only five pounds.  (R. at 402.)  Lastly, the hypothetical individual would be unable to kneel, crouch or crawl.  (R. at 402.)  Hambrick testified that such an individual would not be able to perform Miller's past relevant work and that she possessed no transferable skills consistent with that hypothetical.  (R. at 402.)

The ALJ then asked Hambrick to consider the limitations in the first three hypotheticals and to add that such an individual would have no ability to deal with complex instruction or matters, no ability to interact with supervisors and would be seriously limited, but not precluded, with regard to the public, co-workers and routine.  (R. at 402.)  Hambrick opined that such an individual would not be able to perform Miller's past relevant work and that she possessed no transferable skills consistent with such a hypothetical.  (R. at 403.)

Miller's counsel asked Hambrick to consider that the ALJ found Miller's testimony to be credible and that Miller would have migraine headaches three times

-8-

a month, which would last up to two days at a time and require her to go to bed when the migraines initially approached, experience panic attacks two to three times per month and suffer from pain throughout her body due to fibromyalgia, which would require her to lie down two hours per day. (R. at 403-04.) Hambrick opined that Miller's migraine problems, if as alleged, would result in excessive absenteeism and would not be accepted in the workplace. (R. at 404-05.) As for Miller's alleged panic attacks, Hambrick testified that such a condition would result in approximately eight to 12 hours per month in dealing with the attacks. (R. at 405.) Thus, he opined that such a condition might be tolerated because it was not excessive and would not impact her employment. (R. at 405.) Hambrick then testified that if Miller had to lie down two hours per day due to her fibromyalgia, no employment would be available. (R. at 405.)

In rendering his decision, the ALJ reviewed medical records from Norton Community Hospital; St. Mary's Hospital; Citrus Diagnostic Center; Mountain View Regional Center; Dr. Sandra Brown, M.D.; Louis Perrott, Ph.D., a state agency psychologist; Howard S. Leizer, Ph.D., a state agency psychologist; Medical Associates of Southwest Virginia; Wellmont Holston Valley Hospital; Surgical Associates of Kingsport; Solutions Counseling; Mike Williams, a Licensed Clinical Social Worker, ("LCSW"); Dr. Andrew Chapman, D.P.M.; Dr. G. Danile Gonzalez, M.D., FACS; Dr. Thomas E. Renfro, M.D.; B. Wayne Lanthorn, Ph.D.; and Appalachian Orthopaedic Associates, P.C.

The record contains very little medical evidence pertaining to the relevant time period between the alleged onset date of February 1, 2004, and the date Miller was last

insured for DIB purposes, which was December 31, 2004. Any evidence summarized that is outside the relevant time period is included only for clarity of the record. Miller received treatment at Citrus Diagnostic Center from October 9, 2002, to December 14, 2004. (R. at 199-205.) An x-ray of the left hip dated July 8, 2003, was unremarkable. (R. at 202.) On June 15, 2004, Miller underwent a bilateral mammogram, which also revealed unremarkable findings. (R. at 201.) On December 14, 2004, Miller presented to the Citrus Diagnostic Center and the clinical indication noted left leg edema. (R. at 199.) A doppler ultrasound of the deep venous systems of the bilateral lower extremities was performed and revealed an unremarkable impression. (R. at 199.)

Miller was treated by Dr. Sandra Brown, M.D., from October 9, 2001, to March 16, 2006. (R. at 209-41.) During the relevant time period, Miller complained of problems such as fatigue, tingling in her left leg, swelling in her feet, occasional back pain and joint pain. (R. at 209-41.) Dr. Brown's clinical assessments and impressions included menopausal symptoms, migraines, elevated lipids, left leg edema, plantar fasciitis, vaginitis, stress incontinence, right shoulder pain, left leg pain, cystitis, elevated cholesterol and triglycerides, as well as a medical history that included fibromyalgia. (R. at 209-41.) Miller was prescribed medication such as Evista, Bextra, Cipro and Imitrex. (R. at 209-41.)

The record is devoid of any additional medical evidence from the relevant time period. However, the undersigned will nonetheless summarize the opinion evidence of record, despite the fact that this evidence falls outside the relevant time period.

-10-

Louis Perrott, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on July 25, 2006, finding that Miller suffered from an anxiety-related disorder that was found to be non-severe. (R. at 242-54.) In particular, Perrott noted that Miller's medically determinable impairment failed to precisely satisfy the required diagnostic criteria. (R. at 247.) Perrott determined that Miller was not limited in her activities of daily living and that she had no difficulties maintaining social functioning, concentration, persistence or pace. (R. at 252.) No episodes of decompensation were noted. (R. at 252.) Perrott found Miller's allegations to be only partially credible, and he concluded that the medical evidence failed to document the existence of a severe and disabling mental impairment. (R. at 254.) On December 12, 2006, Howard S. Leizer, Ph. D., a state agency psychologist, completed a PRTF and affirmed Perrott's prior findings. (R. at 259-71.) Leizer noted that, based upon his review of the record, there was no additional information or evidence demonstrating that severe mental impairments existed prior to the date last insured. (R. at 271.)

On July 21, 2006, Dr. Thomas M. Phillips, M.D., noted in a case analysis form that, based upon the available medical records, Miller's complaints and impairments were all non-severe prior and up to the date last insured. (R. at 256.) Similarly, in a case analysis form dated December 7, 2006, Dr. Richard Surrusco, M.D., noted that the medical evidence showed no severe impairment prior to the date last insured. (R. at 274.)

On February 26, 2007, Mike Williams, LCSW, completed a Medical Source Statement Of Ability To Do Work-Related Activities (Mental), in which he found that

Miller was moderately limited in her ability to understand, remember and carry out short, simple instructions. (R. at 307-09.) In addition, Williams found that Miller was markedly limited in her ability to understand, remember and carry out detailed instructions, to make judgments on simple work-related decisions and to interact appropriately with the public and co-workers. (R. at 307-08.) Miller was found to be extremely limited in her ability to interact appropriately with supervisors and in her ability to respond appropriately to work pressures and changes in a routine work setting. (R. at 308.) Williams concluded that Miller's symptoms were disabling due to their unpredictable nature, noting that Miller was unable to consistently work in any setting. (R. at 308.) Lastly, Williams determined that Miller was capable of managing her benefits in her own best interest. (R. at 309.)

On September 4, 2007, B. Wayne Lanthorn, Ph.D., completed a Medical Source Statement Medical Assessment Of Ability To Do Work-Related Activities (Mental) at the request of Miller's counsel. (R. at 320-22.) Lanthorn noted that Miller had a fair ability to follow work rules, relate to co-workers, function independently, understand, remember and carry out detailed, but not complex, job instructions and maintain personal appearance. (R. at 320-21.) He also noted that Miller had a fair to poor/no ability to maintain attention and concentration and a good ability to understand, remember and carry out simple job instructions. (R. at 320-21.) Lanthorn also found that Miller had a poor or no ability to deal with the public, use judgment with the public, interact with supervisors, deal with work stresses, understand, remember or carry out complex job instructions, behave in an emotionally stable manner, relate predictably in social situations and demonstrate reliability. (R. at 321.) Lanthorn opined that Miller retained the ability to manage her benefits in her best

-12-

interest.  (R. at 322.)

Lanthorn also performed a psychological evaluation on September 4, 2007, at the request of Miller's counsel.  (R. at 323-32.)  Lanthorn observed Miller's affect as mixed, noting that she was often listless, appeared to be fatigued, spoke in a monotone voice, exhibited a flat and blunt affect and displayed signs of anxiety.  (R. at 326.)  He described her mood as an agitated depression with clear signs of pain.  (R. at 326.)  Lanthorn also noted that Miller was oriented by person, place, time and circumstance, and she exhibited no signs of ongoing psychotic processes or delusional thinking.  (R. at 327.)  Lanthorn administered the Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), on which Miller achieved a verbal IQ score of 80, a performance IQ score of 78 and a full scale IQ score of 77, placing her in the borderline range of current intellectual functioning.  (R. at 328.)  Lanthorn  reported that Miller earned a verbal comprehension index of 84 and a perceptual organization index of 80.  (R. at 328.)

Lanthorn also administered the Minnesota Multiphasic Personality Inventory - Second Edition test, ("MMPI-2"), which indicated the presence of severe depression. (R. at 329.)  He noted that Miller was very unhappy and pessimistic about the future, and stated that she often felt guilty and was self-critical.  (R. at 329.)  In addition, Lanthorn noted that Miller exhibited feelings of helplessness and inadequacy, as well as a lack of self-confidence.  (R. at 329.)  Lanthorn reported that Miller's depression directly contributed to her disruption of both sleep and appetite functions, a low frustration tolerance and poor concentration.  (R. at 329.)  Furthermore, the results of the MMPI-2 indicated that Miller was highly anxious, tense and worried.  (R. at 329.)

-13-

Lanthorn reported that Miller experienced significant emotional discomfort and that she was likely to experience irrational fears and ruminate about her problems. (R. at 329.) Miller was observed to be plagued with disabling guilt feelings and it was noted that she was easily agitated. (R. at 329-30.) Lanthorn opined that Miller's anxiety and worry contributed to her problems with concentration. (R. at 330.) He further noted that Miller's psychopathology was serious enough that it included confused thinking, difficulties in logic/concentration and impaired judgment. (R. at 330.) Lanthorn found that, due to Miller's marked concerns about the functioning of her body, she would likely experience ongoing physical problems in response to stress and could develop new somatic complaints. (R. at 330.) She was observed to be psychologically naive, emotionally immature, self-absorbed and perhaps demanding of affection and support from her family. (R. at 330.)

Lanthorn further reported that in the broad area of moods, Miller's test results showed that she was experiencing moderate or greater levels of emotional distress, which was characterized by dysphoria, depression, tension and anxiety. (R. at 330.) Lanthorn found Miller to be irritable, grouchy and experiencing little pleasure from life, stating that life in general was a strain for her. (R. at 330.) He also found that Miller was likely to overreact to minor stress with agitation, guilt, self-approach and self-punitiveness. (R. at 330.) Lanthorn reiterated his opinion that Miller lacked self-confidence and had feelings of inadequacy, and he noted that she felt insecure and inferior. (R. at 330.) In the broad area of cognitives, Miller was found to be somewhat obsessed with her personal deficiencies, stating that she viewed herself as useless and "'no good at all.'" (R. at 330.) Her judgment was reported as poor and she exhibited significant memory problems, as well as difficulties making decisions. (R.

-14-

at 330.) In fact, Lanthorn found that it was nearly impossible for Miller to make an important decision. (R. at 330.) Lanthorn explained that Miller was pessimistic and hopeless regarding the possibility of any substantial change in her circumstances, noting that she experienced feelings of guilt when her standards and expectations are not met. (R. at 330.) With regard to interpersonal relations, Lanthorn reported that the test results indicated that Miller was introverted and withdrawn, noting that she found it difficult to talk with unfamiliar people and that she avoided most people when given the opportunity. (R. at 330.)

Lanthorn diagnosed Miller with a major depressive disorder, recurrent and severe, a pain disorder associated with both psychological factors and general medical conditions, which was chronic, an anxiety disorder with both generalized anxiety and panic attacks, borderline intellectual functioning, economic problems, occupational problems and a then-current Global Assessment of Functioning, ("GAF"), score of 45 to 50.[4] (R. at 331.) Lanthorn opined that, from a psychological standpoint, Miller's prognosis was between fair and guarded. (R. at 331.) Miller was found to be capable of managing her own funds. (R. at 331.) Lanthorn explained that the psychological evaluation was unequivocal in revealing a woman that was experiencing marked psychopathology to include severe depression, panic attacks, generalized anxiety, as well as reports of chronic pain syndrome and the multiple

---

[4]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

A GAF of 41-50 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning . . . ." DSM-IV at 32.

-15-

psychological adjustment difficulties associated with those problems. (R. at 331.) He also noted that Miller was socially withdrawn, experiencing significant anhedonia and dysphoria and a low degree of energy. (R. at 332.) Lanthorn noted that Miller was strongly encouraged to continue receiving psychotherapy, noting that, ideally, she would be seen by a psychiatrist to make sure that her psychotropic medications would achieve maximum effectiveness. (R. at 332.) Lanthorn concluded that Miller was incapable of functioning in a 40 hours per week job on a regular basis due to the severity of her psychological difficulties. (R. at 332.)

Williams completed another Medical Source Statement Of Ability To Do Work-Related Activities (Mental) on September 4, 2007. (R. at 333-35.) Williams noted that Miller was mildly limited in her ability to understand and remember simple instructions, and he found that she was moderately limited in her ability to carry out simple instructions and in her ability to make judgments on simple work-related decisions. (R. at 333.) Miller was found to be markedly limited in her ability to understand and remember complex instructions, and Williams determined that she was extremely limited in her ability to carry out complex instructions and make judgments on complex work-related decisions. (R. at 333.) Williams noted that these findings were supported by Miller's impairments in cognitive functioning, particularly with regard to her short-term memory, focus, concentration and distractability. (R. at 333.) Williams further noted that Miller was markedly limited in her ability to interact appropriately with the public, interact appropriately with co-workers and in her ability to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 334.) Williams also determined that Miller was extremely limited in her ability to interact appropriately with supervisors. (R. at 334.) He explained that

his assessment as to these limitations was supported by evidence of her unpredictable mood swings, depressive symptoms and social isolation. (R. at 334.) Williams found Miller to be capable of managing her benefits in her own best interest. (R. at 335.)

On November 19, 2007, Dr. Thomas Renfro, M.D., a treating physician, completed an Assessment Of Ability To Do Work-Related Activities (Physical). (R. at 346-48.) Dr. Renfro found that Miller could occasionally lift items weighing up to five pounds and frequently lift items weighing less than five pounds. (R. at 346.) He indicated that Miller could stand and/or walk for a total of less than two hours in a typical eight-hour workday, explaining that she could do so for only 15 to 20 minutes without interruption. (R. at 346.) Dr. Renfro further found that Miller could sit for a total of four to five hours in a typical eight-hour workday, indicating that she could of sit 20 to 30 minutes without interruption. (R. at 347.) He determined that Miller could occasionally balance, climb and stoop, specifically noting that her occasional climbing was limited to steps only and precluded ladders. (R. at 347.) He noted that Miller should never kneel, crouch or crawl. (R. at 347.) In addition, Dr. Renfro found that Miller's ability to reach, handle, feel and push/pull were affected by her impairments. (R. at 347.) He explained that Miller could not use her hands and arms for repetitive functions due to her pain and limited range of motion. (R. at 347.) No limitations were noted pertaining to Miller's ability to see, hear or speak. (R. at 347.)

Dr. Renfro also determined that Miller should avoid exposure to heights, moving machinery, temperature extremes, chemicals, fumes, dust, vibration and humidity, and he found no restrictions regarding her exposure to noise. (R. at 348.)

Dr. Renfro referenced Miller's conditions such as fibromyalgia, pain in her shoulders, arms, neck, feet and back, bilateral axillary artery blockage, joint stiffness, muscle pain, anxiety, panic attacks and migraines. (R. at 346-48.) Dr. Renfro pointed out that Miller's depression and anxiety would result in problems relating to the public and in her interaction with co-workers and supervisors. (R. at 348.) He opined that Miller's conditions would cause her to miss more than two days of work per month. (R. at 348.) As such, Dr. Renfro concluded that Miller was not capable of performing work activity at the time of the evaluation, and he further explained that such limitations existed prior to her 55th birthday. (R. at 348.)

Dr. Kevin Blackwell, D.O., completed a consultative examination on December 13, 2007. (R. at 349-59.) Dr. Blackwell's assessment included chronic low back pain, hip and knee pain, as well as a history of fibromyalgia, hypertension and anxiety/depression. (R. at 351.) Dr. Blackwell noted that Miller could occasionally lift and/or carry items weighing up to 40 pounds and that she could frequently lift and/or carry items weighing up to 20 pounds. (R. at 352, 354.) He further found that she could sit or stand for a total of eight hours during a typical eight-hour workday, assuming she was permitted to change positions every two hours. (R. at 352, 355.) Dr. Blackwell noted no limitation of hand usage, including fine motor movements and skill activities of the hands. (R. at 352.) He also precluded Miller from activities such as crawling, stair stepping and repetitive ladder climbing. (R. at 352.) Dr. Blackwell found that Miller could occasionally bend, stoop and kneel, and he noted that Miller should avoid exposure to unprotected heights and moving mechanical parts. (R. at 352.) No significant environmental limitations or limitations pertaining to hearing, sight or communication were noted. (R. at 352.) A range of motion form indicated

-18-

that Miller had a decreased range of motion in her shoulders, but all other areas were within normal limits. (R. at 353.) Lastly, Dr. Blackwell found that Miller was able to perform the following activities: shop, travel without a companion for assistance, ambulate without using a wheelchair, walker or two canes or two crutches, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with the use of a single hand rail, prepare simple meal and food for herself, care for her personal hygiene and sort, handle and use paper/files. (R. at 359.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 404.1520 (2008). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2008).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the

-19-

claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated May 5, 2008, the ALJ denied Miller's claim. (R. at 11-17.) The ALJ found that Miller met the insured status requirements of the Act for DIB purposes through December 31, 2004. (R. at 16.) The ALJ also found that Miller had not engaged in substantial gainful activity since the alleged onset date. (R. at 17.) The ALJ determined that the medical evidence established that Miller suffered from severe impairments, namely headaches, back pain, fibromyalgia, COPD, anxiety and depression. (R. at 17.) However, the ALJ found that Miller did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1 at any time prior to January 1, 2005. (R. at 17.) He further found that Miller's allegations regarding her limitations were not totally credible for the time period prior to January 1, 2005. (R. at 17.) The ALJ found that, from the alleged onset date through the date Miller was last insured for DIB purposes, she retained the residual functional capacity to walk for two hours at a time, up to a total of four hours in an eight-hour period, and sit or stand for two hours at a time, up to a total of eight hours in an eight-hour period. (R. at 17.) In addition, the ALJ explained that Miller's capacity for work at the light and sedentary levels of exertion was reduced by her inability to perform jobs that require repetitive lifting or exposure to fumes, allergens or extremes of temperature or humidity, or jobs that involve repetitive climbing, crawling or exposure to heights, or more than

occasional balancing, stooping, kneeling or crouching. (R. at 17.) The ALJ determined that Miller's past relevant work as a secretary and daycare worker did not require the performance of work-related activities precluded by her residual functional capacity, noting that, at no time prior to January 1, 2005, did the limitations imposed by her impairments prevent her from performing her past relevant work. (R. at 17.) Therefore, the ALJ concluded that Miller was not under a disability as defined in the Act and that she was not entitled to benefits. (R. at 17.) *See* 20 C.F.R. § 404.1520 (2008)

Miller argues that the ALJ's decision is not supported by substantial evidence. (Plaintiff's Motion For Summary Judgment And Memorandum Of Law, ("Plaintiff's Brief"), at 6-9.) Miller contends that the ALJ erred by improperly determining her residual functional capacity because he failed to incorporate limitations caused by her severe anxiety and depression. (Plaintiff's Brief at 6-7.) Miller also argues that the ALJ erred by failing to properly consider all evidence of record, noting that the ALJ failed to discuss certain evidence and indicate the weight given to that evidence. (Plaintiff's Brief at 7-9.)

As stated above, the court's function in the case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently

explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

The court will first address Miller's argument that the ALJ erred by improperly rendering his residual functional capacity finding. (Plaintiff's Brief at 6-7.) Specifically, Miller contends that the ALJ failed to incorporate limitations caused by Miller's severe anxiety and depression. (Plaintiff's Brief at 6-7.) Miller claims that because the ALJ found that her impairments of anxiety and depression were severe, he should have incorporated limitations resulting from those impairments in his residual functional capacity finding, and, by failing to do so, Miller argues that the ALJ rendered a decision unsupported by substantial evidence. (Plaintiff's Brief at 6-7.) I disagree.

-22-

In this case, the record contains very little medical evidence from the relevant time period. In fact, there is no evidence of record from the relevant time period that references Miller's mental limitations or mentions any complaints or treatment for anxiety or depression. The court recognizes that Miller sought mental health treatment after the date she was last insured, but, for the purposes of the court's analysis, that evidence is irrelevant. The court is limited to a determination of whether there is substantial evidence to support the ALJ's finding that Miller was not disabled from February 1, 2004, the alleged onset date, through December 31, 2004, the date she was last insured for DIB purposes. Accordingly, because the relevant medical evidence of record is devoid of any mental health limitations resulting from Miller's anxiety and depression, the undersigned finds that the ALJ was justified in his decision to not incorporate further mental limitations in his residual functional capacity finding. Additionally, as noted by the Commissioner, Dr. Gardner, a medical expert who testified at the hearing regarding Miller's psychological condition, opined that there was insufficient evidence prior to February 2006 to offer an opinion as to Miller's mental impairments. (R. at 396.) The court also notes that a vocational expert testified that, based upon the ALJ's residual functional capacity finding, Miller was capable of performing her past relevant work at both the light and sedentary levels. (R. at 401.) Therefore, with regard to this issue, the court finds that the ALJ's residual functional capacity finding is supported by substantial evidence of record.

Miller also argues that the ALJ erred by failing to address all evidence of record and indicate the weight given to each piece of evidence. (Plaintiff's Brief at 7-9.) In particular, Miller points out that the ALJ failed to discuss the findings of Dr. Renfro, who treated Miller from February 16, 2007, to March 20, 2008. (Plaintiff's Brief at

-23-

7-9.)  Thus, according to Miller, by failing to discuss Dr. Renfro's medical opinions and treatment notes, and by failing to discuss the apparent rejection of such evidence, the ALJ's decision was not supported by substantial evidence.  After a review of the record, I find this argument to be without merit.

As stated earlier, in determining whether substantial evidence supports the Commissioner's decision, the court must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence.  *See Sterling Smokeless Coal Co.*, 131 F.3d at 439-40.  In fact, the Commissioner "must indicate explicitly that all relevant evidence has been weighed and its weight."  *Stawls*, 596 F.2d at 1213.  The United States Court of Appeals for the Fourth Circuit has stated that,

> The courts, however, face a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence.  Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's "duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Here, Miller specifically argues that the ALJ erred by failing to adequately discuss the medical opinions and treatment notes of Dr. Renfro, especially the limitations and opinions noted in a medical assessment dated November 19, 2007, nearly three years after the date last insured.  (Plaintiff's Brief at 7-9.)  On November

-24-

19, 2007, Dr. Renfro completed an Assessment Of Ability To Do Work-Related Activities (Physical). (R. at 346-48.) Dr. Renfro found that Miller could occasionally lift items weighing up to five pounds and frequently lift items weighing less than five pounds. (R. at 346.) He indicated that Miller could stand and/or walk for a total of less than two hours in a typical eight-hour workday, explaining that she could do so for only 15 to 20 minutes without interruption. (R. at 346.) Dr. Renfro further found that Miller could sit for a total of four to five hours in a typical eight-hour workday, indicating that she could of sit 20 to 30 minutes without interruption. (R. at 347.) He determined that Miller could occasionally balance, climb and stoop, specifically noting that her occasional climbing was limited to steps only and precluded ladders. (R. at 347.) He noted that Miller should never kneel, crouch or crawl. (R. at 347.) In addition, Dr. Renfro found that Miller's ability to reach, handle, feel and push/pull were affected by her impairments. (R. at 347.) He explained that Miller could not use her hands and arms for repetitive functions due to her pain and limited range of motion. (R. at 347.) No limitations were noted pertaining to Miller's ability to see, hear or speak. (R. at 347.)

Dr. Renfro also determined that Miller should avoid exposure to heights, moving machinery, temperature extremes, chemicals, fumes, dust, vibration and humidity, and he found no restrictions regarding exposure to noise. (R. at 348.) Dr. Renfro referenced Miller's conditions such as fibromyalgia, pain in her shoulders, arms, neck, feet and back, bilateral axillary artery blockage, joint stiffness, muscle pain, anxiety, panic attacks and migraines. (R. at 346-48.) Dr. Renfro pointed out that Miller's depression and anxiety would result in problems relating to the public and in her interaction with co-workers and supervisors. (R. at 348.) He opined that Miller's

-25-

conditions would cause her to miss more than two days of work per month. (R. at 348.) As such, Dr. Renfro concluded that Miller was not capable of performing work activity at the time of the evaluation, and he further explained that such limitations existed prior to her 55th birthday. (R. at 348.)

The court recognizes that the ALJ did not reference the opinions and findings of Dr. Renfro. However, the court notes that the ALJ was under no duty or obligation to do so, as such evidence was irrelevant to the determination of disability for DIB purposes. As discussed above, the relevant time period for the determination of disability in this case was from the February 1, 2004, the alleged onset of disability, to December 31, 2004, the date Miller was last insured for DIB purposes. The medical records detailing Dr. Renfro's findings were dated February 16, 2007, to March 20, 2008, well outside the relevant time period. Miller argues that Dr. Renfro's medical opinion essentially relates back to the relevant time period, in that he opined that the limitations and restrictions he imposed on Miller existed prior to her 55th birthday, which would have been prior to the date last insured. However, this argument fails because there is no evidence within the record to suggest that Dr. Renfro treated Miller during the relevant time period. Moreover, even if Dr. Renfro considered the medical evidence of record from the relevant time period, a finding of not disabled would still be supported, as the medical records from the relevant time period would be insufficient to support such strict limitations as those found by Dr. Renfro.

After a review of the record as a whole, it is obvious that Miller's conditions have worsened since the date last insured. Nonetheless, the court is limited to the

consideration of medical records pertaining to the relevant time period. In this case, the record is insufficient to show that Miller was disabled at any time on or prior to the date she was last insured for DIB purposes. Thus, the court is of the opinion that the ALJ did not err in failing to specifically discuss the findings of Dr. Renfo, as those findings and opinions were rendered well beyond the pertinent time period. Based upon the reasons stated above, the undersigned finds that the ALJ properly considered the relevant evidence and that his residual functional capacity determination is supported by substantial evidence.

Lastly, the court notes that it does not offer an opinion as to whether Miller became disabled after the date last insured. However, as noted above, it is evident that Miller's conditions and symptoms have worsened. Thus, the court advises the claimant that, if eligible, her remaining remedy would be to file a disability application for supplemental security income alleging a new onset of disability date.

### IV. Conclusion

For the foregoing reasons, I will sustain the Commissioner's motion for summary judgment and overrule Miller's motion for summary judgment. The Commissioner's decision denying benefits will be affirmed.

An appropriate order will be entered.

DATED:     This 17th day of August 2009.

/s/  *Glen M. Williams*

SENIOR UNITED STATES DISTRICT JUDGE

Case 2:08-cv-00065-GMW-PMS   Document 14   Filed 08/17/09   Page 28 of 28   Pageid#: 83